Joan PECK, Plaintiff,

v.

C.J. TEGTMEYER, M.D., Defendant.

Civ. A. No. 90–0024–C.

United States District Court,
W.D. Virginia,
Charlottesville Division.

Oct. 7, 1992.

Hunt & Wilson, Charleston, WV and J. Randolph Parker, Parker, McElwain & Jacobs, Charlottesville, VA, for plaintiff.

Rebecca W. West, Charlottesville, VA, Ronald D. Hodges, Roy W. Ferguson, Jr., Charles F. Hilton, Wharton, Aldhizer & Weaver, Harrisonburg, VA and William H. Archambault, pro hac vice, University of Virginia Health Service Foundation, Charlottesville, VA, for defendant.

## MEMORANDUM OPINION

KISER, Chief Judge.

This matter is before the court on defendant's objections to (1) the magistrate judge's order denying defendant's request for a ruling that plaintiff's designated expert is not qualified to testify to the standard of care, and (2) the magistrate judge's report and recommendation recommending that this court deny the parties' motions for summary judgment. For the reasons set forth in this memorandum opinion, this court overrules the magistrate judge's order, accepts the magistrate judge's recommendation of denial of plaintiff's motion for summary judgment, rejects the recommendation of denial of defendant's motion for summary judgment, and grants summary judgment in favor of the defendant.

### I.

On January 13, 1988, plaintiff Joan Peck was admitted to the University of Virginia Hospital for a thyroidal arteriogram. The procedure started at about 11:30 a.m. and was completed about 8:00 p.m. Besides Dr. Tegtmeyer, four other physicians were involved in performing the arteriogram which required the manipulation of catheters through the patient's arteries from the leg and arms to the region of the parathyroid in the neck. A fluoroscope was used to monitor the progress of the catheters through the arteries. Once a catheter was in place, dye was injected and flat x-ray films were taken. Although the procedure took 8 hours, much of the time was used in setting up for a "run." Dr. Tegtmeyer's primary function was to interpret the x-ray films. He was in and out of the examination room during the course of the procedure. The other physicians who participated in the procedure had the primary responsibilities of inserting the catheters and getting them into proper position for insertion of the dye and taking the x-ray films. The plaintiff alleges that defen-

dant, Dr. Tegtmeyer,[1] her attending radiologist, negligently performed the procedure, thereby causing a burn on her back due to excessive exposure to radiation. Inexplicably, there are no records of the amount of radiation Peck was exposed to, but the morning following the arteriogram, Peck awoke with a radiation burn on her back, which worsened with the passage of time. Peck has required several skin grafts.

The plaintiff has identified only one expert witness to testify as to the negligence issue, David Marsden. Dr. Marsden is a radiation physicist; he is not a radiologist nor a medical doctor of any sort. Of plaintiff's other six designated witnesses, three are medical doctors, but none is a radiologist and, by their own admissions, none can testify to the applicable standard of care.

The defendant filed a motion for summary judgment on the ground that plaintiff's evidence cannot, as a matter of law, establish a violation of the applicable standard of care. Specifically, the defendant argues that plaintiff's expert is not qualified to testify to the standard of care for a radiologist and that, because the plaintiff does not have a qualified expert, the plaintiff cannot establish either the standard of care or a violation of the standard of care, two essential elements of a medical malpractice claim.

Subsequently the plaintiff filed a motion for summary judgment grounded, in relevant part, on the doctrine of *res ipsa loquitur.*

At a hearing on July 10, 1992, Magistrate Judge Crigler heard argument on the cross motions for summary judgment. The magistrate judge addressed defendant's motion first. As a threshold matter, the magistrate judge determined the expert qualification question to be nondispositive and, thus, within the magistrate judge's authority under 28 U.S.C. § 636(b)(1)(A) to decide without report and recommendation. Then, from the bench, the magistrate judge denied defendant's request for a ruling that plaintiff's expert is not qualified. The magistrate judge based his ruling on two grounds.

First, the magistrate judge concluded that the qualification of an expert witness is an evidentiary or procedural matter, not a substantive matter, so federal law applies. Thus, according to the magistrate judge, Rule 702 of the Federal Rules of Evidence, rather than § 8.01–581.20 of the Virginia Code, controls the qualification of an expert witness. And, under Rule 702, Dr. Marsden is qualified.

Second, the magistrate judge ruled that, even if federal law does not apply, Dr. Marsden is qualified under Virginia law. Specifically, the magistrate judge found that Dr. Marsden satisfies the "clinical practice" requirement of Virginia Code § 8.01–581.20. Alternatively, the magistrate judge relied on *Hunter v. Burroughs,* 123 Va. 113, 96 S.E. 360 (1918), which ostensibly established two standards of care: a mechanical standard of care and a general professional standard of care. The magistrate judge decided that because the defendant in this case was operating x-ray equipment, the mechanical standard of care applies. And, because Dr. Marsden has expertise in the mechanical operation of such equipment, he is qualified to testify as to the mechanical standard of care.

With respect to the availability of *res ipsa loquitur,* the magistrate judge filed a report and recommendation on July 15, 1992, in which he recommended that plaintiff's motion for summary judgment be denied. However, the magistrate judge did not foreclose plaintiff's use of the doctrine at trial; rather, the applicability of *res ipsa loquitur* would be determined when all the evidence has been heard.

On July 20, 1992, the defendant filed an objection to the magistrate judge's order with respect to the qualification of plaintiff's expert and a request for reconsideration. In addition, the defendant objected to the magistrate judge's report and recommendation on the issue of *res ipsa loquitur.* By order entered July 24, 1992, the magistrate judge denied defendant's request for reconsideration. On July 30, 1992, the defendant renewed his objections. This court held a hearing on the objections on September 1,

---

1. Four other defendant physicians, all hospital residents or fellows, were dismissed from the case on the ground of sovereign immunity by Judge Michael's order of July 17, 1992.

1992, and the matter is now ripe for disposition.

## II.

Pursuant to 28 U.S.C. § 636(b)(1)(A), the district judge may reverse the magistrate judge's order with respect to plaintiff's expert if the factual findings are clearly erroneous or legal conclusions are contrary to law. Additionally, pursuant to 28 U.S.C. § 636(b)(1)(C), the district judge will undertake a *de novo* review of the magistrate judge's report and recommendation.

The expert witness qualification issue and the *res ipsa loquitur* issue were raised by the parties' motions for summary judgment. To carry a motion for summary judgment, the movant must show "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Furthermore,

> the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

*Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

The applicable standard of care and a deviation from that standard are two essential elements of a medical malpractice claim. *Raines v. Lutz,* 231 Va. 110, 341 S.E.2d 194, 197 (1986). If the court finds that the magistrate judge's order is clearly erroneous or contrary to law, or, in other words, that plaintiff's expert is not qualified to testify to the applicable standard of care, then the defendant will be entitled to summary judgment because, without the testimony of plaintiff's expert, the plaintiff will be unable to establish those essential elements of her case.

## III.

At the hearing on defendant's objections, the plaintiff adopted the position that the defendant, as attending physician, was responsible for the proper functioning of the x-ray equipment, for the proper performance of the assisting physicians, and, in general, for anything that went wrong during plaintiff's arteriogram. In essence, the plaintiff relied on the "captain of the ship" theory,[2] although plaintiff's counsel declined to accept the court's suggestion of that terminology. For the reasons that follow, this court will not permit the plaintiff in this case to proceed on such a theory.

First, the "captain of the ship" theory has not been recognized in Virginia. Indeed only one medical malpractice case under Virginia law even mentions "captain of the ship." In *Easterling v. Walton,* 208 Va. 214, 156 S.E.2d 787 (1967), the plaintiff claimed negligence on the part of the defendant surgeon in failing to remove a "lap pad" from plaintiff's abdomen during surgery and in failing to render proper post-operative care. A nurse testified "that the surgeon is the 'captain of the ship' and has complete control over the operation and direction of all persons assisting him in the operating room." *Id.* at 789. However, the plaintiff offered no expert testimony to establish defendant's negligence in failing to remove the lap pad. The trial court struck plaintiff's evidence on the issue of defendant's negligence in failing to remove the lap pad, the jury returned a verdict in favor of the defendant, and the trial court entered judgment upon the verdict.

On plaintiff's appeal, the Virginia Supreme Court of Appeals reversed the trial court's judgment on the ground that the trial court erred in refusing to apply the doctrine of *res ipsa loquitur.* The unrefuted evidence was that the defendant surgeon was in complete charge of the operation as "captain of the ship." *Id.* at 791. The court decided that this evidence, in combination with other evidence in the case, warranted application of

---

2. A theory that would hold the attending physician liable, irrespective of any personal negligence, solely because he is the attending physician—i.e., the captain of the ship. Although this is a form of vicarious liability it does not carry with it the traditional requirements of a master-servant relationship. *McConnell v. Williams,* 361 Pa. 355, 65 A.2d 243, 245–48 (1949).

the doctrine of *res ipsa loquitur*. Nevertheless, the court did not discuss or apply the "captain of the ship" as a legal theory; rather, the court used the phrase "captain of the ship" as a shorthand expression to explain that the evidence showed the surgeon was in total control throughout the operation. Neither *Easterling* nor any other Virginia case has recognized a "captain of the ship" theory to impose liability on a physician who was not personally culpable.

Second, even in jurisdictions where the "captain of the ship" doctrine has been recognized, it has been applied almost exclusively in the operating room context. The doctrine has not been applied to hold a radiologist liable as the "captain of the ship."

■ Third, the Virginia Medical Malpractice Act, Virginia Code §§ 8.01–581.1—.20, is a comprehensive system constructed by the Virginia General Assembly to process medical malpractice claims. Under the Act, claims may be brought against any "health care provider," which is defined to include, *inter alia*, "a physician or hospital, dentist, pharmacist, registered or licensed practical nurse, optometrist, podiatrist, chiropractor, physical therapist, physical therapy assistant, clinical psychologist, [and] health maintenance organization." Va.Code § 8.01–581.1. The Act contains no provision for vicarious liability, and the breadth of the statutory scheme suggests that none is intended. For example, because a physician, a nurse, or a hospital each may be held liable in their own right, there is no basis or reason for holding a physician liable for the conduct of another physician, a hospital nurse, or any other hospital employee.[3]

## IV.

■ The issue of *res ipsa loquitur*, raised by plaintiff's motion for summary judgment, can be disposed of in summary fashion. As the magistrate judge pointed out in his report and recommendation, *res ipsa*

*loquitur* is merely a rule of evidence; "*res ipsa loquitur* means that the facts of the occurrence ... make a case to be decided by the jury, not that they forestall the verdict." *Danville Community Hospital, Inc. v. Thompson*, 186 Va. 746, 43 S.E.2d 882, 887–88 (1947) (quoting *Hines v. Beard*, 130 Va. 286, 107 S.E. 717, 719 (1921); *Sweeney v. Erving*, 228 U.S. 233, 240, 33 S.Ct. 416, 418, 57 L.Ed. 815 (1913)). Thus, even if the doctrine applies in a medical malpractice case like this one and even if the plaintiff satisfies the requisite elements of the doctrine, *res ipsa loquitur* does not entitle the plaintiff to summary judgment. Accordingly, the court accepts the magistrate judge's recommendation that plaintiff's motion for summary judgment be denied.

■ The plaintiff has also interposed the doctrine of *res ipsa loquitur* as a defense to defendant's motion for summary judgment. It is plaintiff's position that even if she is unable to prove by expert testimony that Dr. Tegtmeyer breached the standard of care, the posture of the evidence establishes that *res ipsa loquitur* is applicable and, therefore, the issue of negligence must be submitted to a jury. Plaintiff's reliance on *res ipsa loquitur* in this context must also fail.

The Virginia Supreme Court has stated time after time that for *res ipsa loquitur* to apply, the plaintiff must identify the instrumentality causing the injury and show that it was under the exclusive control of the defendant. *Danville*, 43 S.E.2d at 887; *Easterling*, 156 S.E.2d at 789–90. Although, for purposes of summary judgment, Peck may be able to prove that the x-ray equipment used in her arteriogram was the instrumentality of her injury, she is not able to prove that it was under the exclusive control of Dr. Tegtmeyer. On the contrary, the uncontradicted evidence is that the equipment was owned and maintained by the University of Virginia Hospital, that a substantial portion of the arteriogram procedure was performed by the four physicians who have been dis-

---

3. Of course, traditional vicarious liability principles still apply so that, for example, a hospital might be held liable for the negligence of its employees under a master-servant theory. However, because the plaintiff here has not alleged facts in support of a master-servant relationship

between the defendant and other persons who may have been present during plaintiff's arteriogram, and as no such facts appear from the record, the court does not consider that variety of vicarious liability.

missed and that Dr. Tegtmeyer was not present in the room for very substantial periods of time while the procedure was being performed.

*Danville Community Hospital, Inc. v. Thompson, supra,* upon which Peck so heavily relies, is clearly distinguishable. In *Danville,* a newborn infant was burned while in the hospital's nursery. The suit was brought against the *hospital.* The evidence was that at all times hospital employees were in exclusive charge of the well-being of the infant. In the case at bar it is not the hospital but only Dr. Tegtmeyer—one among several persons or entities who could have been negligent—whom Peck seeks to hold responsible for her burn. Thus, Peck's reliance on *res ipsa loquitur* must fail because the evidence shows that Dr. Tegtmeyer was not in exclusive control of the equipment nor of the procedure which was being performed.

## V.

### A.

■ The court now turns to whether plaintiff's expert may be permitted to testify as to the applicable standard of care. In resolving this issue, the court must decide whether Virginia law or federal law governs the qualification of a standard of care expert or, in terms of *Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), whether the state law is substantive or procedural.

The relevant state law is found at Virginia Code § 8.01–581.20. That statute defines the standard of care and establishes requirements for the qualification of a standard of care expert:

[T]he standard of care by which the acts or omissions are to be judged shall be that degree of skill and diligence practiced by a reasonably prudent practitioner in the field of practice or specialty in this Commonwealth and the testimony of an expert witness, otherwise qualified, as to such standard of care, shall be admitted.... Any physician who is licensed to practice in Virginia shall be presumed to know the statewide standard of care in the specialty or field of medicine in which he is qualified and certified. This presumption shall also apply to any physician who is licensed in some other state of the United States and meets the educational and examination requirements for licensure in Virginia ... A witness shall be qualified to testify as an expert on the standard of care if he demonstrates expert knowledge of the standards of the defendant's specialty and of what conduct conforms or fails to conform to those standards and if he has had active clinical practice in either the defendant's specialty or a related field of medicine within one year of the date of the alleged act or omission forming the basis of the action.

Va.Code § 8.01–581.20(A).

It is beyond dispute that the standard of care itself is substantive. "*What* is such a standard of care, *whether* it has been violated, and *whether* such violation is the proximate cause of plaintiff's injury—in short, the substantive elements of a medical malpractice suit—are all questions to be determined by state law in a diversity action." *Fitzgerald v. Manning,* 679 F.2d 341, 346 (4th Cir. 1982). In addition, it is settled that expert testimony is required to establish the pertinent standard of care as well as a violation of that standard. *Id.* at 347.

While no court has decided expressly whether the expert qualification requirements of Virginia Code § 8.01–581.20 are substantive, at least two federal courts have in fact applied Virginia law. For instance, in *Fitzgerald,* which arose before the enactment of the Virginia Medical Malpractice Act, the Fourth Circuit applied state common law qualification requirements, precursors of the present statutory requirements: "In order to qualify as an expert competent to provide such testimony [on the standard of care], the witness must show familiarity with the 'degree of skill and care' employed by the ordinary, prudent practitioner in the relevant field and community." *Id.* at 347. Similarly, in *Chapman v. Edgerton,* 529 F.Supp. 519 (W.D.Va.1982), which also arose prior to the creation of the Act, this court recognized the Virginia common law standard of care as "that of other like specialists in good standing, in the same or similar localities as the

defendant." *Id.* at 520. The court then concluded that "[i]t is this standard, and the court's explanations of that standard, that will govern the competency of expert witnesses at trial." *Id.* Thus, by their unhesitating application of state law, both *Fitzgerald* and *Chapman* suggest that the qualification of a standard of care expert is governed by state law in a diversity action.[4]

The substantive-procedural question has been explicitly addressed in the context of other "procedural" requirements of the Virginia Medical Malpractice Act. In *DiAntonio v. Northampton–Accomack Memorial Hospital,* 628 F.2d 287 (4th Cir.1980), the Fourth Circuit held that the requirement of prior notice of intention to file a medical malpractice action[5] and the provision for panel review[6] were "so 'intimately bound up' with the rights and obligations being asserted as to require their application in federal courts" under the *Erie* doctrine. *Id.* at 290. In addition, the court held that the provision for admission into evidence of the panel opinion[7] also applies in federal court. *Id.* at 291. The court stated that:

> Though the provision for admission into evidence of the panel opinion be regarded as the resolution of an evidentiary problem, it does not follow that it is the kind of procedural rule which need not be followed in a federal court. It has been recognized that "there are circumstances in which a question of admissibility of evidence is so intertwined with a state substantive rule that the state rule ... will be followed in order to give full effect to the state's substantive policy."

*Id.* (quoting 9 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure: Civil* § 2405 at 326–27 (1971)). The court decided that application of the state provision in federal court would further the state's substantive policy of encouraging and promoting pretrial mediation. Additionally, the court found no countervailing federal policy. In effect, the Fourth Circuit held that certain "procedural" requirements of the Virginia Medical Malpractice Act were substantive and, thus, applicable in federal court.

On this reasoning, the qualification requirements of Virginia Code § 8.01–581.20, like the provisions of the Act at issue in *DiAntonio,* obtain in federal court. While the qualification requirements may be viewed as "procedural" rules, they are "intimately bound up" with a state substantive rule, the standard of care itself. The structure of the statute indicates that the standard of care and the qualification requirements for a standard of care expert are intertwined. First, the standard of care is "that degree of skill and diligence practiced by a reasonably prudent practitioner in the field of practice or specialty in this Commonwealth." Va.Code § 8.01–581.20(A). Second, as noted above, the standard of care must be established by expert testimony. Third, the same paragraph that defines the standard of care prescribes requirements for the qualification of an expert on the standard of care. In other words, under the statutory scheme, the standard of care is that which is testified to by an expert qualified under the statute.

Moreover, the qualification requirements further state policy. As observed in *DiAntonio,* the original purpose of the Act was to lower the cost of medical malpractice insurance by reducing the amount of medical malpractice litigation. 628 F.2d at 290. Like pretrial mediation, the expert qualification requirements pose an obstacle to meritless claims. The qualification requirements help insure that a defendant "health care provider" is held to a fair and accurate standard of care and only found liable if the applicable standard of care and a violation thereof are established.

Furthermore, no countervailing federal interests militate against applying the qualification requirements in federal court.

For these reasons, the qualification requirements for a standard of care expert, as

---

4. Compare *Lee v. Adrales,* 778 F.Supp. 904 (W.D.Va.1991), in which this court determined the Virginia qualification requirements under the Federal Rules of Evidence.

5. Va.Code § 8.01–581.2.

6. Va.Code §§ 8.01–581.2 and 8.01–581.3.

7. Va.Code § 8.01–581.8.

set forth in Virginia Code § 8.01–581.20, are applicable in a diversity case.

### B.

■ At least one jurisdiction has avoided the necessity of deciding whether state law or Fed.R.Evid. 702 governs the qualifications of experts by treating the problem as one of competency of witness under Fed.R.Evid. 601. Rule 601 requires the application of state law in determining competency in diversity cases, when state law supplies the rule of decision. Therefore, reasoned Tennessee federal district courts, to determine the competency of an expert witness in a medical malpractice case, Rule 601 requires that the witness meet the qualifications set forth in the state statute. *Ralph v. Nagy*, 749 F.Supp. 169, 172–73 (M.D.Tenn.1990); *Crumley v. Memorial Hospital*, 509 F.Supp. 531, 532 n. 2 (E.D.Tenn.1978), *aff'd* 647 F.2d 164 (6th Cir.1981). However, when squarely faced with the tension that exists between Rule 601 and Rule 702, the Sixth Circuit declined to resolve it. *Ward v. U.S.*, 838 F.2d 182, 188 (6th Cir.1988).

Given the historical context of Rule 601, it is doubtful that the rule was intended to supplant Rule 702. It appears that Rule 601 has been primarily concerned with the proper application of the various states' dead man statutes. *See* 3 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Evidence* ¶ 601[2] (1992) and 27 Charles A. Wright & Victor J. Gold, *Federal Practice & Procedure* § 6006 (1992). More importantly, it appears that the issue of a witness's standing to testify as an expert is treated as an issue of qualifications rather than an issue of competency by the Fourth Circuit. *Scott v. Sears Roebuck & Co.*, 789 F.2d 1052 (4th Cir.1986) (admissibility of testimony of human factors expert in diversity case governed by Rule 702, rather than state law). Although the concept of using Rule 601 is a novel approach to a troublesome problem, the view expressed in *DiAntonio* better comports with *Erie* and the Federal Rules of Evidence.

### VI.

■ Having decided that the qualification requirements of Virginia Code § 8.01–581.20

apply in this case, the court must decide whether plaintiff's expert meets the statutory requirements.

As discussed above, Virginia Code § 8.01–581.20 sets out requirements for the qualification of a standard of care expert. "Any physician who is licensed to practice" in Virginia, or in another state with equivalent requirements for licensure, is presumptively qualified to testify on the standard of care in his specialty or field of medicine. Because Dr. Marsden is neither a physician nor licensed to practice, he must meet the general qualification requirements of the statute. As amended in 1992, the statute provides in pertinent part:

> A witness shall be qualified to testify as an expert on the standard of care if he demonstrates expert knowledge of the standards of the defendant's specialty and of what conduct conforms or fails to conform to those standards and if he has had active clinical practice in either the defendant's specialty or a related field of medicine within one year of the date of the alleged act or omission forming the basis of the action.

Va.Code § 8.01–581.20(A).

Accordingly, in order to qualify as an expert on the standard of care, plaintiff's expert must:

(1) have expert knowledge of the standards of radiology,

(2) know what conduct conforms to those standards, and

(3) have had active clinical practice within one year of the date at issue,

(4) in either radiology or a related field of medicine.

As explained below, Dr. Marsden fails on all four grounds.

Dr. Marsden holds an M.S. in Radiation Physics from Columbia University and a Ph.D. in Physiology from Jefferson Medical College in Philadelphia. He is certified by the American Board of Radiology (ABR) in Radiological Physics, which includes the physics of Diagnostic Radiology, Nuclear Medicine, and Radiation Therapy. Dr. Marsden has been elected by the ABR to be

a Physics Advisor to the ABR, a position he currently holds. He has served as an oral board examiner in physics for the ABR, and he has drafted the written questions for the physics portion of the board examination in Nuclear Medicine. Since 1968, he has been affiliated with the radiology department at St. Luke's Roosevelt Hospital in New York. He is presently Director of the Radiation Physics Department and the Nuclear Medicine Laboratory at that hospital. In addition, he is an assistant professor of radiology at Columbia University, where he teaches a course in radiation physics to radiology residents. In short, he is eminently qualified in the field of radiation physics.

Notwithstanding the above-recited qualifications, the evidence reveals that Dr. Marsden does not have expert knowledge of the standard of care in radiology or of what conduct conforms or fails to conform to that standard. Significantly, Dr. Marsden is not a radiologist; in fact, he is not an M.D. of any kind. And, although he has consulted extensively on patient cases, he has not treated patients; indeed Dr. Marsden admitted that a radiation physicist "does not get involved with the patient." (Marsden Deposition at 42.) When asked during his deposition to state how long it would take to pass the catheter used to inject the dye for an arteriogram, Dr. Marsden testified: "A radiologist would be better to answer that, someone who does it.... I would be guessing." (Marsden Deposition at 24.) And, while he stated that he was surprised that the procedure in this case lasted eight hours, he based his surprise not on his own knowledge and experience but on the opinions of two radiologists. (Marsden Deposition at 26.)

Even if Dr. Marsden meets the first two statutory requirements for qualification, still he must meet the "clinical practice" requirement. Neither the statute nor any cases define "clinical practice." Dictionary definitions are of some assistance. "Clinical" has been defined as "involving or depending on direct observation of the living patient." *Webster's Third New International Dictionary* 423 (1961). Elsewhere "clinical medicine" has been defined as "[t]he study of

disease and evaluation of the medical situation at the bedside of a patient." 1 J.E. Schmidt, *Attorneys' Dictionary of Medicine* C–247 (1992). Essential to a "clinical practice," then, is the treatment of patients.

Under a common sense reading of the plain language of the statute, Dr. Marsden has never had a "clinical practice" in radiology. He has admitted that, as a radiation physicist, he "does not get involved with the patient." (Marsden Deposition at 42.) Moreover, radiation physics is not a "related field of medicine" to radiology. Indeed radiation physics is not a field of medicine at all. A career in radiation physics, like that of Dr. Marsden, requires no medical training. Even if radiation physics could be considered a "related field of medicine," Dr. Marsden has never had what could be called a "clinical practice" in radiation physics. Because Dr. Marsden has never had a "clinical practice" of any kind, he does not meet the statutory requirements for qualification as an expert on the standard of care.

■ Therefore, Dr. Marsden does not qualify as an expert witness under Va.Code § 8.01–581.20 and cannot testify as to the standard of care for a radiologist. Inasmuch as the plaintiff has designated no other standard of care expert, the plaintiff cannot establish two essential elements of a medical malpractice claim: the standard of care and a violation of that standard.

## VII.

■ This court finds that the magistrate judge's reliance on *Hunter v. Burroughs*, 123 Va. 113, 96 S.E. 360 (1918), is misplaced. The statutory definition of standard of care and the statutory requirements for qualification of an expert on the standard of care were enacted long after *Hunter*, and while *Hunter* does refer to two standards of care, the statute makes no distinction between a mechanical standard of care and a general professional standard of care. Clearly there is only one standard of care: "that degree of skill and diligence practiced by a reasonably prudent practitioner in the field of practice or specialty in this Commonwealth." Va. Code § 8.01–581.20(A).

That single standard obtains regardless of whether or not the alleged negligence involved the use of equipment. *See Gonzalez v. Fairfax Hospital System*, 239 Va. 307, 389 S.E.2d 458 (1990). In *Gonzalez*, the Virginia Supreme Court found that a patient who cut his foot on a screw in a hospital whirlpool tub was required to pursue his action under the Act. There, the court said:

> The alleged negligent acts occurred while [the plaintiff] was receiving treatment as a patient in the hospital. Therefore, [s]he was receiving "health care" as defined by the Act. Additionally, the alleged tort was "based on health care or professional services rendered ... to a patient," which constitutes "malpractice." Finally, [the plaintiff] concedes that the health care [s]he received was rendered by [a] "health care provider[ ]," i.e., ... a physician.

389 S.E.2d at 459 (citations omitted). Under the plain meaning of the Act, plaintiff's claim lies squarely within the Act.

## VIII.

The plaintiff is unable to establish the appropriate standard of care and a breach thereof for want of an expert witness. Nor can the plaintiff proceed on an alternative theory which falls outside of the Medical Malpractice Act. Consequently, summary judgment must be entered for defendant.

### *ORDER*

For the reasons stated in the Memorandum Opinion filed contemporaneously with this Order, it is ADJUDGED and ORDERED that the Plaintiff Peck's motion for summary judgment is DENIED and the Defendant Tegtmeyer's motion for summary judgment is GRANTED. Accordingly, JUDGMENT is entered in favor of all Defendants and against the Plaintiff.